**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CHARLIE NORFOLK CENTER**
**ASSOCIATES, LP,**

        **Plaintiff,**

**v.**                                    **Civil Action No. 2:06cv616**

**NORFOLK REDEVELOPMENT AND**
**HOUSING AUTHORITY,**

        **Defendant.**

<u>**ORDER AND OPINION**</u>

Pending before the court is the defendant's Motion to Dismiss, which the court and the parties now construe as a Motion for Summary Judgment.[1]  After examination of the brief and record, this court determines oral argument is unnecessary because the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument.  The court, for the reasons set out fully herein, **GRANTS** the defendant's motion for summary judgment.

---

[1] The Motion to Dismiss was filed with a supporting affidavit and other exhibits, and the defendant noted in its memorandum in support the possibility of construing the motion as one for summary judgment.  <u>See</u> Fed. R. Civ. P. 12(b) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.").  Here, the plaintiff has treated the motion as one for summary judgment, and has responded with its own exhibits.  The defendant appears to concede this, arguing in its reply brief that the summary judgment standard has been met.  There is therefore no cause to believe that the parties have not been "given reasonable opportunity to present all material made pertinent" to a summary judgment motion.  <u>Id.</u>  Thus, the court will address the defendant's motion as one for summary judgment.

I. Factual Background

The facts of this case stretch back more than a decade.  The plaintiff, Charlie Norfolk Center Associates, LP, is a limited partnership formed under the laws of Connecticut.  It was integral in the development of MacArthur Center, a shopping mall in downtown Norfolk, Virginia that has been credited with spurring a revival of the downtown area.  As part of the development of MacArthur Center, the plaintiff purchased an option from the defendant, the Norfolk Redevelopment and Housing Authority, on a parcel of real property to the north of MacArthur Center (the "Northern Option property").  The parties entered into an option agreement,[2] which defines the rights and responsibilities of each party with regard to the Northern Option property.  Specifically, the option agreement provided that the plaintiff's right to purchase the property was contingent upon the defendant's approval of a development plan submitted by the plaintiff for the property.  Option Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 6(b).  The defendant agreed to consider in good faith any development plan submitted by the plaintiff for the Northern Option property, and to suggest such reasonable changes to the plan as may be necessary to give its approval.  Id.

After extending the time in which to exercise the option a number of times, the exercise period was ultimately extended until May 31, 2001.  See Exhibit 8 to Conroy Affidavit.  On May 25, 2001, the plaintiff exercised its option.  This was acknowledged by letter from the defendant on June 21, 2001.  Pursuant to a clause in the option agreement, the parties agreed to close on the sale by November 21, 2001.  In the interim, the option agreement called for the plaintiff to

---

[2]The option agreement refers to the plaintiff as "Conroy," in reference to its principal, Alexius Conroy.  Exhibit 1 to Conroy Affidavit.  The defendant is referred to in the agreement as "Owner."  Id.

submit its proposed development plan, approval of which was a condition precedent to the actual

purchase of the property.  On November 13, 2001, the plaintiff submitted a plan for

development, including an aerial photograph of the Northern Option property indicating that the

plaintiff planned to continue its use as a surface parking lot but to restripe the parking spaces and

add a chain across part of the lot.  On November 15, 2001, the plaintiff submitted another

development plan, identical to the previous plan except without a restriping of the parking lot.  A

letter enclosed with the plan instructed the defendant to "disregard any previous plans you may

have received with respect to the development of the Property."  Exhibit B to Cooper Affidavit.

The defendant responded by letter dated November 21, 2001, in which it rejected the

proposed development plan as "woefully inadequate" and formally terminated the option.

Complaint, Exhibit 10.  Thus, the Northern Option property was not transferred to the plaintiff,

and in fact the defendant still possesses the parcel, which to date is used as a surface parking lot.

The plaintiff claims that during the interim between the date on which it exercised its option and

the date on which the defendant terminated the option, the defendant took actions to frustrate the

plaintiff and prevent it from completing the various steps necessary to prepare a sufficient

development plan.  Specifically, the plaintiff notes that the defendant delayed in granting it

permission to enter the property and conduct engineering tests, and that once the tests were

completed, the defendant failed to take any action to resolve any of the structural deficiencies.

As a result, the plaintiff's letter of November 13, 2001 advised the defendant that the plaintiff

would cure the physical deficiencies on the Northern Option property.

The plaintiff also claims that the defendant stymied the plaintiff in its plans for

developing the property, rejected proposals for hotel or restaurant use because the defendant

wanted higher-end businesses. Further, the plaintiff alleges that the defendant and the City of Norfolk engaged in talks with an NBA team, the then-Charlotte Hornets, about relocating to Norfolk and playing at an arena that would be constructed on several acres downtown, including the Northern Option property. See Exhibits 2-4 to Conroy Affidavit. Although the plaintiff acknowledges that this deal was never consummated (as, in fact, the Hornets relocated to New Orleans), it avers that the defendant "flirted vigorously and excitedly." Response Brief, at 2. Such actions, claims the plaintiff, were well-publicized, and deterred potential tenants from agreeing to occupy the developed property, thus preventing the plaintiff from completing a development plan.

II. Procedural History

The plaintiff filed the instant complaint in this court on October 31, 2006, alleging breach of contract and unjust enrichment, and seeking either monetary damages or specific performance and the right to purchase the Northern Option property. The court has diversity jurisdiction over this action, as the plaintiff's general partner is incorporated in Delaware and has its principal place of business in Connecticut while the defendant is a political subdivision of the Commonwealth of Virginia.

The plaintiff's breach of contract claim is simple: it alleges that it performed all conditions precedent with regard to the option on the Northern Option property and was ready to perform on the contract, but that the defendant breached the option agreement by not acting in good faith to consider the proposed development plan, by offering the parcel to other purchasers, and by hindering the completion of a development plan for more significant development of the parcel. Because the property in question is land, which is considered by the law to be unique,

4

the plaintiff seeks specific performance of the option agreement. Finally, the plaintiff argues

that, by failing to transfer the Northern Option property on November 21, 2001, the defendant

was unjustly enriched by the continuing stream of rent it has received from the parcel.

After this court entered an agreed order of the parties extending the defendant's time in

which to file a responsive pleading, the defendant filed the instant motion on December 11,

2006, along with a memorandum in support thereof and the affidavit of Stephen Cooper, its

former assistant executive director. The plaintiff filed a response brief on January 5, 2007, along

with the affidavit of Alexius Conroy, its principal. The defendant filed a reply brief on January

16, 2007. The matter is therefore ripe for consideration.

III.  Standard of Review

The defendant relies upon Rule 12(b)(6) of the Federal Rules of Civil Procedure in

support of its motion to dismiss. However, because the defendant asks the court to look outside

of the pleadings in order to evaluate its arguments,[3] the court is required to determine whether

the motion to dismiss should be treated as a motion for summary judgment under Rule 12(b)(6).

When "matters outside the pleadings are presented to and not excluded by the court, a motion to

dismiss for failure . . . to state a claim . . . shall be treated as one for summary judgment and

disposed of as provided in Rule 56." FED. R. CIV. P. 12(b). Accordingly, the court will treat the

defendant's motion to dismiss as a motion for summary judgment.

Summary judgment under Federal Rule of Civil Procedure 56 is only appropriate when

the court, viewing the record as a whole and in the light most favorable to the non-moving party,

---

[3]Specifically, the defendant has provided the court with the affidavit of Stephen Cooper, who served as its assistant executive director during the time period involved in this case, as well as exhibits in support.

5

determines that there exist no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

Once a party has properly filed evidence supporting the motion for summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial.  Celotex Corp., 477 U.S. at 322-24.  Such facts must be presented in the form of exhibits and sworn affidavits.  Failure by the plaintiff to rebut defendant's motion with such evidence will result in summary judgment.  "[T]he plain language of Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  Although the moving party bears the initial burden of stating the basis for its motion, that burden can be discharged if the moving party can show "an absence of evidence to support the non-moving party's case."  Id. at 323, 325.  After the moving party has discharged the burden, the non-moving party must then designate specific facts showing that there is a genuine issue of material fact.  Id. at 324.

To enter summary judgment, a court does not need to determine that there are no factual issues in dispute.  To find against the moving party, however, the court must find both that the facts in dispute are material and that the disputed issues are genuine.  A factual dispute is deemed to be material if it is dispositive of the claim.  See Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).  Similarly, a factual dispute is considered genuine if it is based on more than speculation or inference.  Celotex Corp., 477 U.S.

at 327; Runnebaum v. NationsBank of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997) (en banc),

overruled on other grounds by Bragdon v. Abbott, 524 U.S. 624 (1998).

While it is the movant's burden to show the absence of a genuine issue of material fact,

Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the

non-movant's burden to establish the existence of such an issue.  See Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986).  "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  To survive

summary judgment, the non-moving party must present evidence that is "significantly

probative."  Celotex Corp., 477 U.S. at 327.

IV.  Analysis

A.  The Development Plan

At the core of this case is the question whether the plaintiff's proposal to construct a

chain across a portion of the Northern Option property can possibly constitute a "development

plan" within the meaning contemplated by the option agreement entered into by the plaintiff and

the defendant.  The plaintiff urges that the plan submitted, including keeping the parcel as a

surface parking lot, is within the acceptable uses enumerated in the option agreement.  The

defendant, meanwhile, argues that the installation of a chain cannot possibly be considered

"development," and that a surface parking facility was not permitted by the option agreement.

The parties agree that the language of the option agreement controls in this matter.  That

document provides, in pertinent part:

> Conroy's right to purchase the Property following the exercise of the Option shall be and
> remain contingent upon Owner approving Conroy's plans for the development of the

Property (the Development Plan).  Such Development Plan shall show the intended use of the property which must be for retail, residential, hotel or office use, or any use permitted under Section 1.a.(3)(c) of the Owner's Redevelopment Plan for the Downtown Redevelopment Project - North VA R-8, as in effect on the date hereof (or a combination of uses listed or referred to above in this sentence), and the Development Plan must show the specific use or uses proposed to be constructed on the subject Property by Conroy in sufficient detail to show the location on the site of all improvements, a plan view and elevation of the improvements, the materials to be used in the external facades, the provision for on-site parking (if any) and the approximate gross floor area.

Option Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 6(b).

The agreement specifically references Section 1.a.(3)(c) of the Owner's Redevelopment Plan for the Downtown Redevelopment Project - North VA R-8, which provides: "Land will be made available for redevelopment by private enterprise as indicated on Exhibit 2, the Land Use Plan, such private redevelopment may include public or private parking garages, beautification areas and gardens, landscaping and appropriate commercial structures and accessways."

Redevelopment Plan, Exhibit 7 to Conroy Affidavit, at 1.A.3.c.  Finally, the Land Use Plan cited in the Redevelopment Plan section provides, inter alia, that

[l]and within the Project Area which is not devoted to public uses, semi-public uses, existing private uses or the proposed regional shopping mall may be used for commercial, office, retail or transient housing uses, either singly or by a combination of such uses.  Public uses, such as public parking garages and accessways, can be constructed within areas which are designated for redevelopment by private enterprise in the Land Use Plan, Exhibit 2.

Id. at 1.B.1.a.(3)(c).

Tellingly, within none of the previously-quoted sections does the phrase "surface parking" appear.  While several of them refer to parking garages, the only reference to surface parking is from elsewhere in the Land Use Plan, which indicates that "[l]and has been provided . . . for public surface parking and garages."  Id. at 1.B.1.b.(1)(b).  The plaintiff clings to this language in an attempt to support its contention that surface parking is a permitted use under the

8

option agreement, but such a contention is plainly incorrect.  The option agreement itself does not mention surface parking, nor does Section 1.a.(3)(c), which was referenced in the option agreement.  The only mention of surface parking is in a description of land that had been set aside for public buildings and spaces.  That reference does not provide the basis for holding that a private surface parking lot is an acceptable use under the option agreement.

The plaintiff notes that parking lots and garages are permitted under the zoning applicable to the Northern Option property, but whether property is zoned for a certain use is a different question than whether the plaintiff would be entitled by virtue of its option agreement to use the property in a certain manner.  Indeed, the language of the option agreement and those documents incorporated by reference therein demonstrate that surface parking was not an appropriate or permitted use of the property.  Further, the option agreement indicated that use proposed was "to be constructed."  It is indeed a stretch of the imagination to imagine that a 300-foot long chain constitutes construction.

The option agreement requires the proposed development plan "to show the location on the site of all improvements, a plan view and elevation of the improvements, the materials to be used in the external facades, the provision for on-side parking (if any) and the approximate gross floor area."  Option Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 6(b).  The development plan that was actually submitted by the plaintiff demonstrates no external facades to be constructed at all, much less what materials would be used in such facades.  Further still, the plan does not set out a "gross floor area."  According to zoning regulations applicable in the City of Norfolk, the "gross floor area" of a building is "[t]he sum of the gross horizontal area of the floor(s) of a

building, excluding . . . floor area devoted to off-street parking."[4]  Norfolk Zoning Ordinance 2-3, Exhibit 1 to Reply Brief.  The definition therefore explicitly excludes any space allotted for parking; thus, a proposed surface parking lot would have no gross floor area.  However, the option agreement clearly mandated a showing of the approximate gross floor area, indicating that the type of development contemplated was a building, not a surface parking lot.  General principles of contract interpretation in Virginia require this court to give effect to the words used by the parties in their agreement.  See, e.g., Hughes & Co. v. Robinson Corp., 211 Va. 4, 6-7 (1970) ("In the interpretation of written contracts every part of the contract must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other.") (quotation omitted).  To interpret the words of the option agreement, which explicitly mandate that certain design elements be present in the proposed development plan, as not requiring those elements after all would be to strip entire clauses of meaning.  This the court is unwilling to do.[5]  Thus, the court finds, as a matter of law, that the development plan submitted by the plaintiff did not satisfy an express condition precedent contained in the option agreement.  The defendant therefore acted properly in rejecting the proposed plan.

_____

[4]The plaintiff contends that this definition, which was not specifically incorporated into the option agreement, is therefore not the correct definition to apply to the contract.  However, as an ordinance in effect at the time the contract was formed, its provisions become a part of the contract as if they were specifically incorporated therein.  Marriott v. Harris, 235 Va. 199, 215 (1988).

[5]The plaintiff argues that, had it proposed a parking garage, a use which the defendant seems to acknowledge would have been acceptable, it would have had a "gross floor area" of zero as well.  Even assuming this is relevant, the plaintiff is incorrect: a typical parking garage would include square footage that is neither for parking nor for stairwells or elevator shafts.  Such space might typically be an office for parking attendants, or enclosed walkways connecting the garage to nearby buildings.

B.  Prevention

The plaintiff devotes much of its response brief to the contention that the defendant, by numerous means, prevented the plaintiff from creating a development plan that would involve an actual building on the Northern Option property.  The plaintiff complains that the defendant denied its engineers access to the property to conduct engineering tests, leaving the plaintiff with a limited amount of time in which to identify physical deficiencies of the property.  The plaintiff also alleges that the defendant failed to take any action to resolve the deficiencies that were uncovered by those tests, or to properly subdivide the larger parcel out of which the Northern Option property was to be transferred.

Most seriously, however, the plaintiff claims that the defendant repeatedly rejected several proposals that the plaintiff presented, and failed to raise any objections to the plaintiff's suggestion that the property be kept as a surface parking lot.  Specifically, the plaintiff avers that it proposed developing the site into an extended-stay hotel, but that the defendant requested a Ritz-Carlton hotel instead.  Likewise, when the plaintiff suggested a restaurant, the defendant allegedly demanded that it be a Morton's or Ruth's Chris Steakhouse.  The plaintiff claims that the tenants that the defendant wanted were simply not interested in the Norfolk market or in that location.  Further, the plaintiff alleges that the defendant and the City of Norfolk were actively engaged in negotiations in an effort to bring the Charlotte Hornets basketball franchise to Norfolk, part of which plan would involve the construction of a new sports arena using, in part, the Northern Option property.  These negotiations allegedly took place beginning in August, 2001, after the plaintiff had indicated to the defendant that it was exercising its option on the property.

11

Given these facts, the argument is put forward by the plaintiff that the defendant so hindered the satisfaction of a condition precedent to the transfer of the Northern Option property as to trigger the prevention doctrine.  Succinctly put by the Virginia Supreme Court, the doctrine holds that "a party cannot insist upon a condition precedent, when its non-performance has been caused by himself."  Parrish v. Wightman, 184 Va. 86, 92 (1945) (quotation omitted).  Thus, claims the plaintiff, because the defendant hindered the fulfillment of a condition precedent–the presentation of a satisfactory development plan–the defendant cannot now use the fact that the condition was not met to avoid performance on the contract.

This argument, however, is legally barred.  As explained in Parrish, "the [prevention] doctrine is purely one of waiver; active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition, eliminates it and makes the promise absolute."  Id. at 93 (quotation omitted).  However, the doctrines of waiver and estoppel may not be asserted against a governmental entity such as the defendant when it acts in its governmental capacity. See, e.g., Wolfe v. Bd. of Zoning App. of Fairfax County, 260 Va. 7, 18 (2000); Brunty v. Smith, 22 Va. App. 191, 196 n.5 (Va. Ct. App. 1996).  As Virginia courts have held time and time again, the activities of a housing authority in purchasing, clearing, and reselling for development blighted land is a proper governmental function.  See, e.g. City of Charlottesville v. DeHaan, 228 Va. 578, 592 (1984).  In fact, this court addressed this same issue in a prior lawsuit, finding that the defendant was performing a governmental function with respect to this precise redevelopment project.  Norfolk Fed'n of Bus. Dists. v. Dep't of Hous. & Urban Dev., 932 F.Supp. 730, 744 & 747 (E.D. Va. 1996).  Therefore, the defendant cannot be said to have waived any conditions precedent to the option agreement in this case.

12

Because the defendant is bound to act only within its statutory authority, any acts outside of that authority are <u>ultra vires</u> and void <u>ab initio</u>.  <u>See, e.g.</u>, <u>Byrd v. Martin, Hopkins, Lemon & Carter, P.C.</u>, 564 F.Supp. 1425, 1428 (W.D. Va. 1983).  Here, the defendant's ability to act is restricted by Section 36-53 of the Code of Virginia, which requires that the defendant condition the sale or lease of land on the obligation of purchasers or lessees to use it for a designated purpose, begin work on improvements within a fixed period of time, and comply with other conditions.  VA. CODE ANN. § 36-53.  As the Virginia Supreme Court explained, "Section 36-53 is designed to prevent a recurrence of the conditions which blighted the area by requiring that the land so sold or leased by an authority to private enterprise will be made subject to such restrictions and conditions as will carry out the purposes of the [Housing and Redevelopment] Act."  <u>Hunter v. Norfolk Redev. & Hous. Auth.</u>, 195 Va. 326, 336 (1953).  The prevention doctrine, then, cannot apply against the defendant in contravention of its statutory mandate to dispose of property to private developers in accordance with governing law, as its application would make the transfer of such property void for want of authority.

Even were the plaintiff able to assert the prevention doctrine against the defendant, it would be unable to succeed on that basis, as it was in fact not prevented from submitting a valid development plan.  "[I]n order to excuse nonperformance of a contract, the action of the party whose conduct is alleged to have prevented performance must be wrongful, and accordingly, in excess of his legal rights."  <u>Whitt v. Godwin</u>, 205 Va. 797, 800-01 (1965) (quotation omitted).  Here, the plaintiff complains that the defendant did not permit it to inspect the Northern Option property until some thirty days after the plaintiff exercised its option.  However, the plaintiff acknowledges that it was permitted to make the inspection and did in fact provide the defendant

with the results within the 60-day window specified in the option agreement.  That the defendant

then refused to cure the alleged deficiencies was within its right: the option agreement permitted

the defendant to simply terminate the agreement, which the defendant elected to do.  <u>See</u> Option

Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 6(a).  Following this election, the plaintiff had a

right to cure any alleged deficiency itself, and it indicated that it planned to do so after closing.

Exhibit 11 to Conroy Affidavit.  There is no indication, then, that the defendant's actions were

wrongful, or in excess of its legal rights, and therefore the prevention doctrine is inapposite.

The plaintiff further avers that the defendant failed to cure defects in the title to the

property.  However, the option agreement only required the defendant to cure such defects as

would impact the plaintiff's intended use of the Northern Option property.  <u>See</u> Option

Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 4(a); Exhibit 14 to Conroy Affidavit (letter from

the defendant explaining that it could not cure alleged title defects until it knew the intended use

of the property).  Thus, the defendant acted within its rights, as it was only required to provide

clear title at closing, and only to the extent necessary for the plaintiff's use, which was not

disclosed until November 13, 2001, and which was in fact not in compliance with the contract's

requirements.  Such action cannot meet the requirement in Virginia for demonstrating

prevention.

With regard to the subdivision of the Northern Option property that the plaintiff claims

should have been done by the defendant, the same requirement existed in the option agreement:

the defendant was obligated to subdivide the property if "subdivision approval is required in

connection with the approved Development Plan or other municipal approvals."  Option

Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 6(b).  Without an approved development plan, the

defendant could not be expected to determine whether subdivision was required.  The defendant

was therefore within its rights to decline to subdivide the property before a development plan

had been submitted and approved, and thus the prevention doctrine does not apply.

Finally, the plaintiff claims that the defendant discouraged tenants from agreeing to

occupy the property by insisting that certain high-end companies locate there or by wooing the

NBA's Hornets franchise to Norfolk with the prospect of an arena to be built on the property.

Unfortunately, this claim again fails to rise to the level of prevention, as the defendant had no

duty to pre-approve any proposals submitted by the plaintiff.  Indeed, the option agreement

simply required that the defendant review in good faith any such development plan–and the only

development plan submitted by the plaintiff consisted of an aerial photograph showing a chain to

be built across the existing parking lot.  Although the option agreement did specifically forbid

the defendant from "sell[ing] or offer[ing] or agree[ing] to sell the Property to any other party

during the life of th[e] option,"  Option Agreement, Exhibit 1 to Conroy Affidavit, at ¶ 3, the

plaintiff stops short of claiming that the defendant actually did offer to sell the property to

anyone.  Response Brief at 18 ("While it may not have actually offered the property for sale to

others . . . .").  Indeed, save for innuendo and speculation, there is no concrete evidence on the

record in this case that indicates the defendant breached this provision of the option agreement.

Although the plaintiff complains that the defendant's flirtations with the Hornets had a

chilling effect on tenant commitments, it admits that it could have submitted a development plan

without commitments from specific tenants.  Response Brief at 17-18.  The plaintiff claims that

the development plan it did ultimately submit was never intended to be built, but that it had

hoped that the defendant would continue to work with it to create a plan for a hotel, restaurant, or

15

retail space on the Northern Option property.  The plaintiff admits, however, that it could have submitted such a plan instead of the development plan that it did submit.  None of the alleged actions taken by the defendant prevented the plaintiff from submitting a more elaborate development plan.  Therefore, as a matter of law the plaintiff may not avail itself of the prevention doctrine, as the defendant was within its legal rights to act as it did.

## C.  Timeliness

The plaintiff claims that its submission of an "interim" development plan comported with the requirements of the option agreement.  In so claiming, it must argue that the option agreement did not require that "time is of the essence."[6]  While it is correct that the agreement itself does not specifically state that "time is of the essence," courts have generally held that such a clause is presumed in an option contract, even where not explicitly stated.  E.g., Berkow v. Hammer, 189 Va. 489, 497 (1949) ("It is generally held that time is of the essence of the option.").  The option agreement had a termination date, which had been extended by the agreement of the parties, and before which the plaintiff exercised its option.  However, the exercise of the option did not conclude the parties' responsibilities under the option agreement: rather, it triggered new duties, including the plaintiff's duty to submit a development plan, that had to be undertaken in order to create a binding contract to sell the Northern Option property.

---

[6]Courts ruling in equity have generally held that time is not deemed of the essence unless explicitly stated so.  See, e.g., Boston v. Shackelford, 162 Va. 733, 755 (1934) ("In contracts for the sale of land equity has established the rule that unless expressly made so by the terms of the contract or by special circumstances, time is not essential.").  Therefore, the plaintiff argues, it may still be entitled to equitable relief–specific performance–even if the court determines that he may not recover at law.  Insofar as the plaintiff claims that the parties explicitly considered and rejected a "time is of the essence" clause, such evidence is parol, and therefore inadmissible in interpreting a contract such as this, which is complete and unambiguous on its face.  See McComb v. McComb, 226 Va. 271, 274 (1983).

16

As detailed <u>supra</u>, these responsibilities were material conditions precedent, and the failure of the plaintiff to submit a valid development plan was a breach of a condition precedent.  Although the option agreement provided that the closing date might be extended under certain circumstances, none of these addressed the development plan.  It is clear, then, that the plaintiff's assertion that time was not of the essence with regard to the submission of a development plan is incorrect.  Therefore, its failure to submit a valid development plan within the time contemplated by the option agreement precludes the plaintiff's claim for specific performance.

D.  Good Faith

The plaintiff also avers that, because the option agreement called for the exercise of "good faith" on the part of the defendant in reviewing the proposed development plan, summary judgment is inappropriate.  The plaintiff cites <u>Hoover Color Corp. v. Bayer Corp.</u>, 199 F.3d 160, 164 (4th Cir. 1999), in support of this contention.  However, <u>Hoover Color</u> was decided in the context of the Robinson-Patman Act, an antitrust law which provides a statutory defense to liability by the showing of good faith.  <u>See</u> 15 U.S.C. § 13(b).  And indeed, the Fourth Circuit noted that summary judgment had been granted in a case applying similar law.  <u>Hoover Color</u>, 199 F.3d at 166-67 (citing <u>Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.</u>, 971 F.2d 37 (7th Cir. 1992)).  Outside of limited contexts such as that found in <u>Hoover Color</u>, the Fourth Circuit has shown no reluctance to affirm a grant of summary judgment where good faith is an issue.  <u>See, e.g.</u>, <u>Wachovia Bank, N.A. v. Federal Reserve Bank of Richmond</u>, 338 F.3d 318, 321-23 (4th Cir. 2003) (affirming a grant of summary judgment that had rejected as a matter of law defenses based on a lack of good faith and commercial reasonableness).  Thus, the court is not precluded from granting summary judgment in favor of the defendant, where, as here, it is

17

clear as a matter of law that the defendant exercised good faith in rejecting the proposed

development plan as plainly unsatisfactory under the terms of the option agreement.

Although the plaintiff avers that the absence of a specific termination clause in paragraph

6(b) of the option agreement indicates that the parties intended that the defendant not be

permitted to terminate the agreement upon receipt of an unsatisfactory development plan, this

argument essentially puts the proverbial cart before the horse.  Paragraph 6(b) makes the

plaintiff's right to purchase the Northern Option property contingent upon the submission by the

plaintiff of a development plan that conforms with the option agreement.  Because the plaintiff

failed to submit such a development plan, it's contractual rights never vested, and therefore the

option agreement never became a binding contract for the sale of real estate.  Because the

plaintiff did not submit a conforming development plan before the closing date, the option

expired by its terms.  <u>See</u> Option Agreement, Exhibit 1 to Conroy Affidavit, at ¶¶ 1 & 4(b).

Thus, the defendant had ample authority in the contract for refusing to propose changes to the

development plan that was submitted by the plaintiff, and was plainly entitled to terminate any

further negotiations.  Even had the defendant terminated the agreement pursuant to paragraph

6(b) of the agreement, that paragraph only requires good faith consideration of the proposed

development plan.  Because the development plan was clearly not in conformity with the

requirements of the agreement, the defendant acted in good faith in rejecting the plan and did not

unreasonably deny its approval.  Therefore, the defendant's actions were in accord with the

provisions of the option agreement.

E.  Unjust Enrichment

The plaintiff finally argues that it is entitled to damages on the basis of the defendant's

unjust enrichment.  This claim arises out of the plaintiff's allegation that it was given the option as part of the consideration it received for agreeing to develop the MacArthur Center, and that therefore the defendant received the benefit of the plaintiff's development services.  However, nothing in the language of the option agreement indicates that if the plaintiff failed to comply with its terms, it would be entitled to compensation for time spent on other development.  Because the plaintiff did not satisfy a clear condition precedent to the full exercise of the option, it forfeited its right to purchase the Northern Option property.  The plaintiff's claim for unjust enrichment, therefore, must fall to the defendant's summary judgment motion.

## V.  Conclusion

There can be no doubt that the plaintiff's proposed development plan–consisting entirely of a chain strung across the already-existing parking lot–was not within the requirements called for by the option agreement, and therefore that the defendant acted properly in rejecting the plan and terminating the sale of the Northern Option property.  The plaintiff cannot allege that the defendant waived this condition precedent, because such a waiver would have been outside the scope of the defendant's statutory authority.  Even if the prevention doctrine could be applied to this case, the facts demonstrate that the defendant did not act to prevent the plaintiff from submitting a development plan that comported with the option agreement.  Therefore, summary judgment in favor of the defendant is proper.

Because there exists no genuine issue of material fact upon which a jury might base a verdict in the plaintiff's favor, and because the defendant is entitled to judgment as a matter of law, the court **GRANTS** the defendant's Motion to Dismiss, having construed it as a motion for summary judgment.  The plaintiff's claims are **DISMISSED**.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record for all parties.

It is so **ORDERED**.

_____/s/_____
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

March 26, 2007
Norfolk, Virginia